# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG A. IRVING,<br><br>                              Plaintiff,<br>   vs.<br><br>EBIX, INC.; EBIX SOFTWARE INDIA PRIVATE LIMITED,<br><br>                              Defendants. | CASE NO. 10-CV-762 JLS (BLM)<br><br>**ORDER: GRANTING IN PART AND DENYING IN PART MOTION FOR WRIT OF ATTACHMENT**<br><br>(Doc. No. 4) |

Presently before the Court is Plaintiff's motion for a writ of attachment. (Doc. No. 4) Also before the Court are Defendants' opposition and Plaintiff's reply. (Doc. Nos. 10 & 13.) The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion.

## BACKGROUND

Plaintiff Craig Irving brings this suit against Defendants Ebix, Inc. and Ebix Software India Private Limited on behalf of the shareholders of ConfirmNet Corporation. (*See* Compl. ¶¶ 1–3.) He wishes "to enforce [the shareholders'] entitlement to the full amount of the 'Second Earn Out' plus interest, pursuant to an Agreement and Plan of Merger . . . [between] Ebix, Inc., ConfirmNet Corporation, Ebix Software India Private Limited, ConfirmNet Acquisition Sub, Inc., and Plaintiff Shareholders' Representative." (*Id.* ¶ 2.)

The parties entered into this agreement on November 24, 2008. (*Id.* ¶ 8.) The agreement provided the holders of ConfirmNet Corporation with, *inter alia*, cash at the time of the closing and

1  future contingent consideration. (*See* Compl., Ex. A (Merger Agreement) §§ 1.2(a) & (b).) The
2  contingent consideration consisted of three "Earn Outs." (*Id.* § 1.2(b).) These payments were to be
3  calculated as multiples of either Ebix's gross revenue or incremental increase in gross revenue,
4  depending on the "Earn Out" period. (*Id.*)

5       The "Second Earn Out," the subject of dispute here, consisted of "cash consideration
6  equivalent to 1.538 times the incremental increase, if any, of Gross Revenue for the 12-month period
7  beginning January 1, 2009 as compared to the Gross Revenue for the 12-month period beginning
8  January 1, 2008." (*Id.*) Defendants were to pay the "Second Earn Out" promptly after financial
9  results for the 12-month period beginning January 1, 2009 are tabulated . . . (but in no event later than
10 30 days after the end of calendar year 2009)." (*Id.*) Additionally, Defendants were also required by
11 the Agreement to "deliver to each Shareholder a copy of the financial statements . . . and a certificate
12 showing the calculation of the Contingent Merger Consideration for the applicable period, certified
13 by the Chief Financial Officer of Parent to be a good faith calculation of the Contingent Merger
14 Consideration derived from the accounting records of [Defendant] ('Contingent Gross Revenue
15 Certificate')." (*Id.* § 1.2(b)(i).)

16      Plaintiff alleges that Defendants did not timely pay the "Second Earn Out," nor did they deliver
17 the Contingent Gross Revenue Certificate. (Compl. ¶ 12.) On February 12, 2010, Defendants
18 allegedly proposed a Second Earn Out schedule to which Plaintiff responded with requested revisions.
19 (*Id.* ¶ 13.) Plaintiff also claims that on March 9, 2010 Defendants agreed to the suggested revisions
20 and stated that the money would be transferred on March 11, 2010. (*Id.* ¶ 14.) Defendants shortly
21 thereafter informed Plaintiff of a new deduction, did not transfer the money at the time designated.
22 (*Id.*) On March 12, Defendants delivered the Contingent Gross Revenue Certificate for the Second
23 Earn Out, which indicated that the payment would be "nearly $550,000 less than the amount to which
24 the parties agreed three days earlier." (*Id.* ¶ 15.) Defendants also stated "that they would not make
25 any payment to Plaintiff . . . unless and until Plaintiff . . . agreed to accept almost $550,000 (exclusive
26 of interest) less than was owed." (*Id.* ¶ 20.) Plaintiff threatened to sue unless Defendants paid the full
27 amount Plaintiff expected. (*Id.* ¶ 21.) On March 26, 2010, Defendants transferred $2,975,386 to
28 Plaintiff. (*Id.*) Because this was not the full amount Plaintiff believed owed on the Second Earn Out

and did not include interest, Plaintiff filed suit on April 12, 2010. (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 64(a) allows a party to invoke any remedy for seizing property allowed under the law of the state in which the district court sits. In California, writs of attachment are governed by the Civil Procedure Code sections 481.010 through 493.060. Section 484.90(a) sets forth four elements that the Plaintiff must show in order for the Court to issue such a writ. "(1) The claim upon which the attachment is based [must be] one upon which an attachment may be issued. (2) The plaintiff [must] establish[] the probable validity of the claim upon which the attachment is based. (3) The attachment [must] not sought for a purpose other than the recovery on the claim upon which the attachment is based. (4) The amount to be secured by the attachment [must be] greater than zero." Cal. Civ. Proc. Code § 484.90(a). Further, when the request for attachment occurs "in an action for a claim of money which is based upon an express or implied contract[,] . . . the total amount of such claim [must be] a fixed or 'readily ascertainable' amount not less than $500.00." *Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co.*, 112 F. Supp. 2d 1178, 1181–82 (C.D. Cal. 2000) (citing Cal. Civ. Proc. Code § 483.010(a)).

This "provisional remedy" is designed "to aid in the collection of a money demand." *Kemp Bros. Constr., Inc. v. Titan Elec. Corp.*, 53 Cal. Rptr. 3d 673, 674 (Cal. Ct. App. 2007). However, "[a]ttachment is a harsh remedy because it causes the defendant to lose control of his property before the plaintiff's claim is adjudicated." *Martin v. Aboyan*, 196 Cal. Rptr. 266, 269 (Cal. Ct. App. 1983) (citation omitted). Because of this, the statutory requirements are "strictly construed." *Kemp Bros.*, 53 Cal. Rptr. 3d at 674–75; *see also Blastrac, N.A. v. Concrete Solutions & Supply*, 678 F. Supp. 2d 1001, 1004–05 (C.D. Cal. 2010); *Pos-A-Traction*, 112 F. Supp. 2d at 1181 ("Attachment is a purely statutory remedy, which is subject to strict construction." (citing *Jordan-Lyon Prods., Ltd. v. Cineplex Odeon Corp.*, 35 Cal. Rptr. 2d 200, 203–04 (Cal. Ct. App. 1994))). Moreover, the Court is required by statute to hold a hearing before issuing a writ. Cal. Civ. Proc. Code § 484.040.

//
//
//

## ANALYSIS

As previously stated, there are six distinct elements which Plaintiff must establish in this case prior to the issuance of a writ. They will be addressed in turn below.

### I. THIS CLAIM IS ONE UPON WHICH A WRIT OF ATTACHMENT MAY ISSUE

The first requirement under section 484.90(a) is that the "claim upon which the attachment is based [must be] one upon which an attachment may be issued." There is no question that Plaintiff's breach of contract claim is one upon which an attachment may be issued. Attachment based on breach of contract is specifically contemplated by Civil Procedure Code section 483.010(a) ("an attachment may be issued . . . in an action on a claim . . . for money . . . based upon a contract"). Defendants do not dispute this. The Court **FINDS** this element satisfied.

### II. THE AMOUNT TO BE SECURED IS GREATER THAN ZERO

Next, the Court **FINDS** that the amount to be secured by the attachment is greater than zero. Cal. Civ. Proc. Code § 484.90(a)(4). The Complaint states that Plaintiff is seeking at least $595,068.20. (*See, e.g.*, Compl. at 8.) This is obviously greater than zero and Defendants, by their silence, concede the point.

### III. THIS CLAIM IS FOR A 'READILY ASCERTAINABLE' AMOUNT NOT LESS THAN FIVE HUNDRED DOLLARS

Further, since this is an action for a claim of money which is based upon an express or implied contract, the Plaintiff must also establish that the total amount of his claim is a fixed or readily ascertainable amount not less than $500.00. Cal. Civ. Proc. Code § 483.010(a). The Court **FINDS** that Plaintiff's claim is both readily ascertainable and more than five hundred dollars.

In *CIT Group/Equip. Fin., Inc. v. Super DVD, Inc.*, 115 Cal. Rptr. 3d 927 (Cal. Ct. App. 2004), the court was confronted with the argument that "the contract in this case does not [present a fixed or readily ascertainable amount] because at the time the contract was executed there were too many uncertainties regarding the amount of damages." *Id.* at 929. "'[I]t is a well-recognized rule of law in this state that an attachment will lie upon a cause of action for damages for a breach of contract where the damages are readily ascertainable by reference to the contract and the basis of the computation of damages appears to be reasonable and definite. The fact that the damages are

unliquidated is not determinative. But the contract sued on must furnish a standard by which the amount due may be clearly ascertained and there must exist a basis upon which the damages can be determined by proof.'" *Id.* (quoting *Lewis v. Steifel*, 220 P.2d 769, 771 (Cal. Ct. App. 1950)). In other words, "it is not necessary that the amount owed appear on the face of the contract." *Id.* (citing *Bringas v. Sullivan*, 273 P.2d 336, 340 (Cal. Ct. App. 1954)).

Under this standard, the court found that attachment was proper in that case. Specifically at issue, the parties had entered into a lease "set[ting] forth the rental period and the monthly rent due." *Id.* at 930. The court found that this "provided a clear and definite formula for the computation of damages." *Id.*

However, the *CIT* court also noted some examples of cases where the contract itself did not specify how much was owed but damages were still sufficiently certain. For example, a writ of attachment issued on a contract requiring payment on a percentage of income and commission basis which had been performed for "nearly two and a half years." *Id.* at 929 (citing *Walker v. Phillips*, 22 Cal. Rptr. 727 (Cal. Ct. App. 1962)). Another cited case, "involved an eight-year lease of a coin-operated music machine" where the "defendant agreed to pay plaintiffs 50 percent of all moneys deposited in the machine." *Id.* at 929–30 (citing *Bringas v. Sullivan*, 273 P.2d 336 (Cal. Ct. App. 1954)).

These cases persuade the Court to find that damages are sufficiently ascertainable here. The agreement between Plaintiff and Defendants states that the amount owed in the second earn out is "[a] cash consideration equivalent to 1.538 times the incremental increase, if any, of Gross Revenue for the 12-month period beginning January 1, 2009 as compared to the Gross Revenue for the 12-month period beginning January 1, 2008." (Merger Agreement § 1.2(b).) The agreement defined "Gross Revenue" to mean "those revenues realized by the [ConfirmNet] or, as applicable, the Surviving Corporation, from the Business, as determined in accordance with [Generally Accepted Accounting Principles (GAAP)]." (Merger Agreement, App. A at A-4.) Documentation provided by Defendants provides the basis for Plaintiff's claims and offers a clearly ascertainable figure owed should Plaintiff prevail.

Defendants' invocation of *American Manufacturers Mutual Insurance Company v. Carothers*

1 *Construction Inc.*, 2007 WL 2729849 (E.D. Cal. 2007), is unhelpful.  Although that court concluded
2 that attachment was improper, it does not provide any useful analysis.  Instead, it simply concluded
3 that the "amount of any damages owed by Defendants to Plaintiffs remains disputed and in flux due
4 to unresolved factual issues as to those damages."  *Id.* at *1.  Without context of what remained in
5 dispute in that case it is impossible to analogize to the present facts.  The *American Manufacturers*
6 court's observation could be said of any case prior to jury verdict.  If that were the controlling
7 standard, a writ of attachment would never issue.

8 Further, there is no basis for Defendants' assertion at oral argument that a writ of attachment
9 should only issue if it can be calculated using "lawyer math skills."  The statute says that the amount
10 should be "readily ascertainable," but never says that the underlying computation must be simple.  But
11 regardles, the math this case is simple.  The contract provides for a very straightforward calculation,
12 requiring nothing more than basic mathematical operations and the underlying information disclosed
13 by Defendants.

14 In light of the above, the Court **FINDS** that the damages in this case are "a fixed or readily
15 ascertainable amount not less than five hundred dollars."

16 **IV.   THE PLAINTIFF'S PURPOSE FOR SEEKING THE WRIT IS FOR RECOVERY ON HIS CLAIM**

17 Next, the Court **FINDS** that Plaintiff has established that his purpose in seeking a writ of
18 attachment is proper.  Plaintiff declares that he is "seeking a Writ of Attachment solely to create a
19 judicial lien on Defendants' assets pending a determination on the merits of this case, and for no other
20 purpose." (Doc. No. 4-3 (Irving Decl.) ¶ 29.)  Defendants argue that this is not true, claiming that "all
21 evidence is to the contrary." (Opp. at 10–11.)  Defendants' cite their status as a public companies with
22 publicly available financial records and significant available cash to satisfy any legitimate judgment.
23 (*Id.*)  Thus, they reason that there is no "risk that Plaintiff will be unable to recover . . . should he
24 prevail."  (*Id.* at 11.)  Moreover, attachment "will inconvenience Ebix and could have the effect of
25 seriously disrupting Ebix's ability to conduct business."  (*Id.*)

26 The Court **FINDS** Defendants' arguments highly unpersuasive.  They offer no evidence that
27 Plaintiff is acting out of an improper purpose.  Being a public company with publicly available
28 financial records is cold comfort should no assets be available to satisfy a future judgment.  Moreover,

the availability of cash now does not mean that assets will be available at the time of a theoretical judgment. Furthermore, that this would inconvenience Ebix does not mean that Plaintiff's motive is improper. Thus, the Court will rely on the only direct evidence of Plaintiff's intent before it at present and find that Plaintiff's purpose in seeking the writ of attachment is not improper.

## V. THE PROBABLE VALIDITY PLAINTIFF'S CLAIM

Having addressed section 483.010(a) and the first, third, and fourth requirements under section 484.90(a), the Court turns to the decisive issue, the second factor under section 484.90(a). This requires Plaintiff to "establish[] the probable validity of [his] claim." Cal. Civ. Proc. Code § 484.90(a)(2).

"A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Civ. Proc. Code § 481.190. The Court makes this determination by "consider[ing] the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation." *Loeb & Loeb v. Beverly Glen Music, Inc.*, 212 Cal.Rptr. 830, 837 (Cal. Ct. App. 1985). "[I]t is not enough for the plaintiff to make out a prima facie case for breach of contract; rather, the plaintiff must also show that the defenses raised are 'less than fifty percent likely to succeed.'" *Blastrac, N.A. v. Concrete Solutions & Supply*, 678 F. Supp. 2d 1001, 1005 (C.D. Cal. 2010 (citing *Pet Food Express, Ltd. v. Royal Canin USA Inc.*, 2009 WL 2252108, at *5 (N.D. Cal. 2009)); *see also Intervest Mortgage Inv. Co. v. Skidmore*, 2008 WL 5385880, at *7 (E.D. Cal. Dec. 19, 2008) (noting that section 484.090 speaks to the outcome of the litigation and not just a prima facie case).

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1399 (1990)).

At the outset, the Court **FINDS** that Plaintiff has established elements 1 and 2 of his breach of contract claim. Defendants do not contest this conclusion.

The primary focus of both parties is whether three deductions from the Second Earn Out were

improper and in breach of the Merger Agreement. (*See* Attachment Motion at 12–15; Attachment Opp. at 6–9.) To the extent that Plaintiff is able to demonstrate that the deductions are improper, he will establish elements 3 and 4. Thus, each deduction is discussed below.

### A. The First Allegedly Improper Deduction

The first alleged improper deduction involves $158,333 in revenue from Defendants' customer Republic Services. (Memo. ISO Motion at 12.) Plaintiff claims that the inclusion of this revenue is supported by an invoice issued by Defendants on October 31, 2009 "which shows on its face that it is the subscription fee for the October through December 2009 fourth quarter." (*Id.* (citing Kinslow Decl. ¶ 10 & Kinslow Decl., Ex. J).) He also argues that this conclusion is supported by the fact that the parties "had previously agreed that 2009 Gross Revenue should obviously include $158,333 . . . for revenue earned and received from Republic Services *in 2009*." (*Id.* (citing Kinslow Decl. ¶ 10 & Kinslow Decl., Ex. G).)

Defendants assert that "invoice 147020309-1, covered the three month period of December 2009, January 2010, and February 2010." (Opp. at 7.) Since under GAAP Defendants "could not recognize the revenue for service provided to Republic Services in January 2010 and February 2010 until such service was rendered and the revenue actually earned," part of the fee listed in the invoice should not be part of the Second Earn Out. (*Id.*)

Given the evidence presented in this motion, the Court **FINDS** that Plaintiff **HAS NOT** established the probable validity of prevailing with respect to the first deduction. This is because income for services performed in 2010 cannot be recognized in 2009.

Accrual basis accounting recognizes income "when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy." Treas. Reg. § 1.446-1(ii)(A); *see also* Staff Accounting Bulletin No. 101, 64 Fed. Reg. 68,936 (Dec. 9, 1999). This is true regardless of whether the company is paid before or after it renders the services entitling it to that income. In other words, if a company using accrual basis accounting requires a client to pay before it actually does the contracted-for work, that company may not recognize the money received as income until the work gets done.

In this case, there are five invoices before the Court. The invoice upon which Plaintiff heavily

1  relies states that it is the "4th Installment" and covers the time period from "October–December
2  2009." (Kinslow Decl., Ex. J.) A second, repeatedly cited by Defendants, also states that it is the "4th
3  Installment," but notes the time period as "Dec 09–Feb 10." (Irving Decl., Ex. D at EXD_0121.)
4  Three other invoices are also before the Court, covering installments 1, 2, and 3. (*See id.* at
5  EXD_0115, EXD_0117, & EXD_0119.) None of those invoices directly states to what time period
6  it applies, but instead list the contract period of "March 2009 – February 2010." (*Id.*)

7  The Court finds that, given this evidence, Plaintiff has not established the probable validity of
8  the impropriety of this deduction. It is undisputed that the contract at issue covered the months of
9  March 2009 through February 2010. As such, five sixths of the work on the contract occurred in 2009
10 so, absent proof otherwise, the Court must conclude that only five sixths of the contractual payments
11 can be properly recognized as income in 2009.

12 As to Plaintiff's argument that Defendants have not shown that this deduction is proper, it must
13 fail. The statute makes clear that it is Plaintiff's burden to establish the probable validity of his claim.
14 In this case, it is Plaintiff's evidence which defeats the probable validity of the claim. Moreover, the
15 events leading up to this lawsuit where Defendants allegedly agreed to Plaintiff's position and then
16 changed their mind don't alter this conclusion because the revenue still cannot be recognized until it
17 is earned. To reiterate, the Court **FINDS** that Plaintiff **HAS NOT** established a probable validity of
18 success on the first allegedly improper deduction, nor, consequently, a probable validity regarding the
19 interest allegedly owed thereon.

20 B. The Second Allegedly Improper Deduction

21 According to Plaintiff, the second improper deduction was asserted as "an 'adjustment due to
22 an 'Overstatement of 2008 Revenues from 1st Earn Out Payment'" in the amount of $213,393.
23 (Memo. ISO Motion at 13.) Plaintiff argues that the parties "entered into a binding letter of
24 agreement" which provided that "'[f]or purposes of the Second Earn Out . . . the 2008 Gross Revenues
25 were $5,120,210.'" (*Id.* (quoting Irving Decl., Ex. E ("First Earn Out Settlement") at EXE_0125)
26 (emphasis omitted).)

27 Defendants believe that "Ebix and Plaintiff disagreed on the amount owed on the First Earn
28 Out, and Ebix retained an independent auditor to determine the amount actually owed to Plaintiff, as

required by section 1.2(b)(vi) of the [Merger] Agreement." (Opp. at 7 (citing Merger Agreement § 1.2(b)(vi) and Kerris Decl. ¶ 13).) Since the audit "was a time consuming process," it was not until after the agreement that "Ebix concluded that the preliminary payment of the First Earn Out Contingent Consideration was overstated by $213,393." (*Id.* at 7–8.) Further, Defendants argue that "Plaintiff acknowledged the overstatement in a letter dated June 8, 2010." (*Id.* at 8 (citing Kerris Decl., Ex. E).)

The Court **FINDS** that Plaintiff's claim for breach of contract on the second improper deduction has probable validity. This claim is fairly simple and Defendants' contrary arguments fail to address the fundamental dispositive factor. That is, Plaintiff has provided the Court with a document signed by both Plaintiff and Defendant's Chief Financial Officer which agrees that "'[f]or purposes of the Second Earn Out . . . the 2008 Gross Revenues were $5,120,210.'" (First Earn Out Settlement at EXE_0125.) Moreover, the parties agreed to a specific First Earn Out payment in settlement of Plaintiff's claims.

As to Defendants' claim that Plaintiff "acknowledged the overstatement," the Court is unpersuaded. The alleged "acknowledgment" occurred in a letter dated June 8, 2009. (Kerris Decl., Ex. E.) That letter recognizes and vociferously disputes Defendants' position regarding the gross revenue figure for 2008. (*See id.* at 27–29.) To call this an "acknowledg[ment of] the overstatement" is misleading. The letter is better characterized as a claim that Defendants were understating the 2008 gross revenue figure. Regardless, this letter is irrelevant because it predates the June 30, 2009 settlement in which the parties agreed to both the remainder of the First Earn Out payment and the gross revenue figure for 2008. (First Earn Out Settlement at EXE_0125.)

Further, to the extent Defendants retained an independent auditor, it was not in conformance with the procedures set forth in the Merger Agreement. The Agreement specifically provides: "If the Parties are unable to agree upon the amount of . . . Consideration due hereunder, the Parties shall . . . cause an independent accountant reasonably satisfactory to the Parent and the Shareholders' Representative . . . to review the disputed item(s) and amount(s)." (Merger Agreement § 1.2(b)(vi).) First, the Parties clearly *were* able "to agree upon the amount of . . . Consideration due" making this provision inapplicable. Plaintiff presents a signed agreement accepting a certain amount of

consideration for the First Earn Out. (First Earn Out Settlement at EXE_0125–EXE_0126.) Second, the Kerris Declaration makes clear that the retention of the independent auditor was unilateral. (Kerris Decl. ¶ 13 ("Ebix retained an independent auditor to resolve discrepancies and determine the amount actually owed to Plaintiff.").) There is no evidence Plaintiff found this auditor "reasonably satisfactory." Given these two flaws, Defendants cannot hide behind the "independent auditor" provision of the Merger Agreement.

For Defendants to now effectively attempt to renege on that agreement by claiming that the agreed-upon figures were overstated would make the agreement settling the First Earn Out disputes a nullity. Defendants have given the Court no good reason to allow that to happen. In light of this, the Court **FINDS** that Plaintiff has established the probable validity of the second improper deduction allegation in his breach of contract claim and the accompanying interest.

### C. The Third Allegedly Improper Deduction

Plaintiff's third deduction issue centers around certain receivables Defendants acquired with ConfirmNet "that were allegedly written off in 2009." (Memo. ISO Motion at 13.) Plaintiff first argues that "the Merger Agreement does *not* assure Defendants collectability of 100% of the ConfirmNet accounts receivable." (*Id.* at 14.) Thus, Plaintiff believes that "Defendants cannot assert a claim" regarding these receivables. (*Id.*) Second, Plaintiff argues that "Defendants' own documentation contradicts their claims" because they "do not consider the . . . accounts receivable to be uncollectable." (*Id.*) According to Plaintiff, "Defendants did not write-off any of these accounts receivable in 2009, as about one-third of these accounts receivable have in fact been collected, and collection efforts just began in January 2010 in regard to the other two-thirds of the accounts recievable." (*Id.*) Third, Plaintiff argues "that these delinquent accounts receivable were not written off in 2009[] and [Plaintiff] . . . believes that they have not been written off yet." (*Id.*) He comes to this conclusion because "Defendants have provided no documentation . . . showing these amounts were actually written off." (*Id.*) Next, "these accounts receivable are collectable [because] . . . Mr. Kerris[, Ebix's Chief Financial Officer,] admits many of them were collected prior to the issuance of Defendants' Contingent Gross Revenue Certificate for the Second Earn Out." (Reply at 7.) Beyond that, Plaintiff believes that "Defendants [have] not establish[ed] why they would have written off

accounts receivable that they previously realized as revenue and are, in fact, still collecting." (*Id.*) Finally, Plaintiff believes that if Defendants want to write off these accounts receivable, they are required by their "financial statement for the year ended December 31, 2009, filed March 16, 2010" to "writ[e] off [the accounts] <u>as bad debt expense</u>" rather than a reduction in revenue. (*Id.* (emphasis in original).)

Defendants counter by arguing that this reduction is proper. (Opp. at 8.) They claim that "revenue from accounts receivable can only be recognized to the extent that the underlying accounts receivable are actually collectible." (*Id.*) Moreover, Defendants argue that to include these uncollected accounts receivable "would be in violation of GAAP." (*Id.*)

The Court finds that Plaintiff has established the probable validity of his claim with respect to the third challenged deduction. The Merger Agreement provides that the amount of the Second Earn Out is 1.538 times the incremental increase in gross revenue[1] from 2008 to 2009. The Agreement defines "gross revenue" as "those revenues realized by the Company or, as applicable, the Surviving Corporation, from the Business, as determined in accordance with GAAP." (Merger Agreement, App'x A at EXA_0062.) Providing more specificity, International Accounting Standard 18 defines Revenue as "the gross inflow of economic benefits during the period arising in the course of the ordinary activity of an entity when those inflows result in increases in equity, other than increases relating to contributions from equity participants."

Given this definition, it is probable that the bad debt write-offs are improper. These receivables were related to income recognized before the merger occurred. Defendants' inability to collect on these accounts has no effect on "the *gross inflow* of economic benefits" (or the "revenues realized") during 2009. Rather, as stated in Defendant's financial statement, receivables written off are expenses which do not affect a company's yearly gross revenue.[2] Of course these write offs would effect the company's bottom line net income. However, the Second Earn Out is not calculated based on net income, making expenses incurred, such as these write-offs, irrelevant to the calculation of the

---

[1] Although the Merger Agreement excludes certain revenue from its calculations, there is no evidence that the receivables at issue fall within the stated exclusions.

[2] This is also the standard practice for uncollectible receivables pursuant to GAAP. See Statement of Financial Accounting Standards No. 5.

1 Second Earn Out.

2 Even ignoring the fact that the collectability of these receivables is totally unrelated to 2009 gross revenue, Defendants' arguments here make little sense. Their brief talks about recognizing "revenue from accounts receivable," but the recognition of revenue and the company's ability to collect the cash owed by their customer are not generally connected. As discussed above, revenue is earned "when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy." Treas. Reg. § 1.446-1(ii)(A). Defendants do not dispute their right to receive the income, only their ability to collect that income. Thus, even if the right to the revenue had arisen in 2009, it would still be improper to reduce gross revenue simply because the receivables were uncollectable.

D. Interest Owed

Finally, Plaintiff argues that Defendants are also liable for interest on the late "partial payment . . . of $2,975,386." (Memo. ISO Motion at 15.) Plaintiff is correct. California Civil Code § 3289 states that where a contract "does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

In this case, the Merger Agreement states an interest rate with regard to "underpa[yments]"; they are to be paid "at a rate of eight percent (8%) per annum," using a simple interest calculation. (Merger Agreement § 1.2(b)(vi).) The agreement does not, however, state what rate of interest would apply to a late initial payment.

So the Court applies the rate set out by section 3289 to Defendant's initial payment. That payment was due on January 30, 2010 and the partial payment was made on March 26, 2010. As such, 55 days passed between the date the payment was due and the date the payment was made. At ten percent simple interest per annum, Plaintiff has a established a probable validity that Defendant owes an additional $44,834.58 ($2,975,386.00 * 10% * (55 days/365 days)).

Plaintiff suggests that the actual amount owed is $53,110.20. That number appears to be calculated to include the alleged improper deductions. However, Plaintiff has only shown probable validity on two of the three deductions. Moreover, the eight percent interest rate applies to any disputed items on which Plaintiff prevails in front of the independent accountant. (*Id.*) Therefore,

Plaintiff's claim has probable validity with respect to an additional $3,684.83 ($305,673.00 * 8% * (55 days/365 days)).

In sum, Plaintiff has a probable validity that Defendant owes $48,519.41.  However, at oral argument, Plaintiff and Defendant informed the Court that Defendant tendered $35,000.00 to cover the interest which Defendant believes that it owes.  As such, the Court reduces the amount of interest to $13,519.41.

## CONCLUSION

For the reasons stated, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion.  The motion is **GRANTED** as to the second and third alleged improper deductions, **DENIED** as to the first improper deduction, and **GRANTED IN PART AND DENIED IN PART** with respect to interest owed.  Therefore, the Court hereby **ISSUES** a writ of attachment in the amount of $319,192.41 ($213,393.00 + $92,280 + $13,519.41).

IT IS SO ORDERED.

DATED: August 10, 2010

Honorable Janis L. Sammartino
United States District Judge