# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRAIG A. IRVING,<br><br>　　　　　　　　　　　　Plaintiff,<br>　vs.<br><br>EBIX SOFTWARE INDIA PRIVATE LIMITED; EBIX, INC.,<br><br>　　　　　　　　　　　　Defendants. | CASE NO. 10-CV-762 JLS (BLM)<br><br>**AMENDED ORDER:**<br>**(1) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT;**<br>**(2) SETTING STATUS HEARING**<br><br>(Doc. No. 35) |

Presently before the Court is Plaintiff's motion for partial summary judgment. (Doc. No. 35.) Also before the Court are Defendants' opposition and Plaintiff's reply. (Doc. Nos. 39 (Opp'n), 40 (Reply).) Having considered the parties' arguments and the law, the Court **GRANTS** Plaintiff's motion.

## FACTUAL BACKGROUND

On or about November 1, 2008, Plaintiff Craig A. Irving, as shareholders' representative for the former shareholders of ConfirmNet Corporation (the shareholders), entered into a written agreement and plan of merger with Defendants Ebix, Inc. and Ebix Software India Private Limited, ConfirmNet Corporation, and ConfirmNet Acquisition Sub, Inc. (Doc. No. 35-2 (Irving Decl.) ¶¶ 1, 3; *see id.* Ex. A (Merger Agm't).) The merger agreement entitled the shareholders to certain consideration in connection with the merger, including future contingent consideration. (Irving Decl.

¶ 4.) The future contingent consideration consisted of "earn out" payments, "each to be calculated pursuant to the terms of the Merger Agreement and the gross revenue for certain future periods." (*Id.* ¶ 5.)

Relevant here, the merger agreement required Defendants to pay a second earn out "based in part upon the incremental increase of ConfirmNet's gross revenue for 2009 compared to 2008." (*Id.* ¶ 6.) The merger agreement provides:

> Second Earn Out.  A cash consideration equivalent to 1.538 times the incremental increase, if any, of Gross Revenue for the 12-month period beginning January 1, 2009 as compared to the Gross Revenue for the 12-month period beginning January 1, 2008 . . . will be payable to the Shareholders by Parent and Intermediate Parent, jointly and severally (the "**Second Earn Out**").  This cash consideration, in accordance with the Merger Consideration Certificate, will be payable promptly after financial results for the 12-month period beginning January 1, 2009 are tabulated by Parent (*but in no event later than 30 days after the end of calendar year 2009*) . . . .

(Merger Agm't § 1.2(b) (italics added).)  Thus, under this provision, the second earn out was payable no later than January 30, 2010.

In addition, the merger agreement required Defendants to submit to the shareholders "their financial statements and a certificate showing a 'good faith calculation' of the Second Earn Out based upon Defendants' accounting records."  (Irving Decl. ¶ 7.)  The merger agreement provides:

> Not later than . . . January 30, 2010 (for the Second Earn Out) . . . Parent shall deliver to each Shareholder a copy of the financial statements of the Parent and/or Surviving Corporation and a certificate showing the calculation of the Contingent Merger Consideration for the applicable period, certified by the Chief Financial Officer of Parent to be a good faith calculation of the Contingent Merger Consideration derived from the accounting records of Parent (the "**Contingent Gross Revenue Certificate**").

(Merger Agm't § 1.2(b)(i).)

On June 30, 2009, the parties entered into a letter agreement regarding, *inter alia*, the second earn out. (Irving Decl. ¶ 15; *id.* Ex. D.)  As to the second earn out, the letter agreement provides: "For purposes of the Second Earn Out which will be based on growth in Gross Revenue for 2009, the 2008 Gross Revenues were $5,120,210 ($3,519,840, representing the Gross Revenue for the first three quarters of 2008, plus $1,600,370, representing the Gross Revenue for the final quarter of 2008)." (*Id.* Ex. D, at EXD_0095.)

The shareholders did not timely receive payment of the second earn out or the contingent gross revenue certificate pursuant to the terms of the merger agreement.  (Irving Decl. ¶ 9.)  On March 12,

2010, Plaintiff received an executed contingent gross revenue certificate for the second earn out. (*Id.* ¶ 10.) Defendants certified that the amount of the second earn out was $2,975,386. (*Id.* ¶ 12.) In arriving at the certified amount, Defendants made three deductions to the incremental increase in ConfirmNet's gross revenue for 2009 compared to 2008. (*Id.*) Relevant here, Defendants deducted from the second earn out $213,393 allegedly attributable to an overstatement of the 2008 gross revenue figure used to calculate the first earn out (the second deduction). (*Id.*)

On April 12, 2010, Plaintiff filed suit alleging that Defendants breached the merger agreement by failing to pay the second earn out in accordance with the merger agreement. (*See* Compl.)

## PROCEDURAL BACKGROUND

On May 5, 2010, Defendants moved to dismiss Plaintiff's complaint or stay the case pending arbitration. (Doc. No. 6.) On August 10, 2010, the Court granted Defendants' motion insofar as it sought a stay. (Doc. No. 18 (MTD Order), at 15.) However, the Court found that the dispute regarding Defendants' obligations under the letter agreement "must be resolved prior to this case proceeding to arbitration." (*Id.* at 8.) Accordingly, the Court ordered Plaintiff to file a motion for summary judgment regarding Defendants' obligations under the letter agreement by October 1, 2010. (*Id.* at 15.) Plaintiff filed his motion for summary judgment on September 27, 2010.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element

1  of her case with respect to which she has the burden of proof." *Id.* at 322–23. "Disputes over
2  irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc.*
3  *v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

4      Once the moving party establishes the absence of genuine issues of material fact, the burden
5  shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.
6  *Celotex*, 477 U.S. at 324. The nonmoving party cannot oppose a properly supported summary
7  judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S.
8  at 256. When ruling on a summary judgment motion, the court must view all inferences drawn from
9  the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*
10 *v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

11     Federal Rule of Civil Procedure 56(g) provides for partial summary judgment. See Fed. R.
12 Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order
13 stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the
14 case."). "The partial summary judgment is merely a pretrial adjudication that certain issues shall be
15 deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up
16 litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed. R. Civ.
17 P. 56 advisory committee's note (addressing former Federal Rule of Civil Procedure 56(d)).

18     **DISCUSSION**

19     Pursuant to the Court's Order granting in part and denying in part Defendants' motion to
20 dismiss, Plaintiff moves for summary judgment regarding Defendants' obligations under the letter
21 agreement.[1] (Doc. No. 35-1 (Mem. ISO MSJ), at 5.)

22 **1.**     **Whether the Arbitration Provision Applies**

23     At the threshold, Defendants argue in opposition to Plaintiff's motion that "any dispute
24 regarding the amount of the Second Earn Out—including the propriety of the $213,393 deduction—is
25 to be decided by an arbitrator under the terms of the [merger] Agreement." (Opp'n 7–8.) This

26

---

27     [1] Plaintiff's motion also addresses the related claim that Defendants breached the merger
    agreement and the letter agreement by improperly deducting $213,393 from the second earn out. (*See*
28 *generally* Mem. ISO MSJ 7–10.) As the Court concludes *infra*, this claim is properly before the
    Court, and Defendants had ample opportunity to address it.

1 argument lacks merit. As the Court noted in its Order on Defendants' motion to dismiss, Defendants
2 have effectively conceded that the dispute regarding the letter agreement is not arbitrable. (MTD
3 Order 8.) Accordingly, the Court concluded that "the extent of Defendants' obligations under [the
4 letter] agreement must be resolved prior to this case proceeding to arbitration" and ordered Plaintiff
5 to file a motion for summary judgment on the issue. (*Id.*)

6 In support of their argument, Defendants rely on an isolated statement in the Court's Order on
7 Defendants' motion to dismiss, in which the Court held that "the language of the [arbitration]
8 provision is clear that the parties' 'reasonable expectation' was that disputes over amounts owed on
9 the Contingent Merger Consideration would be sent to arbitration." (*Id.* at 5; *see* Opp'n 7–8.)
10 Defendants' reliance on this statement is misplaced. This motion does not involve a dispute over
11 amounts owed on the contingent merger consideration. It involves Plaintiff's claim that Defendants
12 breached the merger agreement and the letter agreement. And as the Court stated in its prior order,
13 the arbitration provision does not imply "that the parties expected a breach of contract claim . . . to be
14 decided by an arbitrator." (MTD Order 5.) Just because the Court must delve into how Defendants
15 calculated the second earn out does not *necessarily* mean that the dispute is subject to the arbitration
16 provision. Accordingly, Plaintiff's motion is properly before the Court.

17 **2.    Whether Defendants Breached the Agreements**

18 Plaintiff contends that "Defendants improperly deducted $213,393 from the Second Earn Out
19 by unilaterally interjecting a different 2008 Gross Revenue figure than expressly stipulated to by the
20 parties in [the letter agreement]." (Mem. ISO MSJ 10.) Defendants, however, argue "that the Letter
21 Agreement was never intended by the parties to prohibit [Defendants] from deducting an overpayment
22 of the First Earn Out from the Second Earn Out." (Opp'n 8.)

23 *A.    Interpretation*

24 Under California law, contract interpretation is a question of law. *SDR Capital Mgmt., Inc.*
25 *v. Am. Int'l Specialty Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004); *see also Parsons v.*
26 *Bristol Develop. Co.*, 402 P.2d 839 (Cal. 1965). "The fundamental goal of contractual interpretation
27 is to give effect to the mutual intention of the parties." *Byrne v. Laura*, 60 Cal. Rptr. 2d 908, 916 (Cal.
28 Ct. App. 1997). "When a contract is reduced to writing, the parties' intention is determined from the

1 writing alone, if possible." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 513 (Cal. Ct. App. 1992). "If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992).

In interpreting the contract, a court must first determine whether the contract is ambiguous. See *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). "A contract provision is considered ambiguous when the provision is susceptible to more than one reasonable interpretation." *SDR Capital Mgmt.*, 320 F. Supp. 2d at 1046 (citing *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1213 (Cal. 2003)). However, the "mere fact that a word or phrase in a policy may have multiple meanings does not create an ambiguity." *Palmer v. Truck Ins. Exch.*, 988 P.2d 568, 574 (Cal. 1999). "Ambiguity cannot be based on a strained instead of reasonable interpretation" of the contract's terms. *McKee v. State Farm Fire & Cas. Co.*, 193 Cal. Rptr. 745, 746 (1983). The contract must be interpreted as a whole. *MacKinnon*, 73 P.3d at 1213.

The Court can determine whether the contract is ambiguous on its face or by using extrinsic evidence of the parties' intent. *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 66 Cal. Rptr. 2d 487, 492 (Cal. Ct. App. 1997); *see also Founding Members*, 135 Cal. Rptr. 2d at 513–14. If a party contends that the contract is ambiguous based on extrinsic evidence,

> [T]he test for the admissibility of extrinsic evidence to explain the meaning of the contact is not whether the contract appears to the court to need interpreting "but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Therefore, the court must provisionally receive all credible evidence concerning the parties' intentions to determine whether the contract language is reasonably susceptible to the interpretation urged by a party. If in light of the extrinsic evidence the language is reasonably susceptible to the interpretation urged, then the extrinsic evidence is admitted to aid in interpreting the contract.

*Wagner v. Columbia Pictures Indus., Inc.*, 52 Cal. Rptr. 3d 898, 901 (Cal. Ct. App. 2007) (quoting *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)). However, if no parol evidence is admitted, or if the evidence is not contradictory, the trial court's resolution of the ambiguity is a question of law. *See Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Cal. Ct. App. 1992).

Here, the key provision states: "For purposes of the Second Earn Out which will be based on growth in Gross Revenue for 2009, the 2008 Gross Revenues were $5,120,210 ($3,519,840,

1 representing the Gross Revenue for the first three quarters of 2008, plus $1,600,370, representing the 2 Gross Revenue for the final quarter of 2008)." (Irving Decl. Ex. D, at EXD_0095.) Nothing on the 3 face of the provision indicates that its statement of 2008 gross revenue was intended as an "interim 4 measure," as Defendants contend. (Opp'n 12.) Instead, the plain language of the provision clearly 5 states that the second earn out would be calculated based on 2008 gross revenue of $5,120,210. 6 Defendants proposed interpretation would contradict the provision's plain language by allowing 7 calculation of the second earn out based on some other 2008 gross revenue figure.[2]

8 Moreover, a review of the entire agreement further supports the Court's interpretation. The 9 parties unambiguously intended the agreement to settle certain claims regarding the first earn out. 10 (*See* Irving Decl. Ex. D, at EXD_0095 ("Parent agrees to pay to the Shareholders and the Shareholders 11 agree to accept $185,289 . . . *in settlement of the dispute regarding the First Earn Out*." (emphasis 12 added)).) As part of the settlement, the parties agreed upon a statement of 2008 gross revenue to be 13 used in calculating the second earn out. (*Id.*) "[F]or Defendants to now effectively attempt to renege 14 on [the letter] agreement by claiming that the agreed-upon figures were overstated would make the 15 agreement settling the First Earn Out disputes a nullity. Defendants have given the Court no good 16 reason to allow that to happen." (Doc. No. 17 (Writ of Attach. Order) 11.)

17 As such, the Court finds the letter agreement unambiguous based on its plain language alone 18 and that it is not "reasonably susceptible" to Defendants' proposed interpretation. *Winet*, 6 Cal. Rptr. 19 2d at 557. The interpretation Defendants urge would contradict the contract's plain language and 20 render the agreed-upon 2008 gross revenue figure subject to Defendants' unilateral revision.

21 Further, the Court, after provisionally receiving all extrinsic evidence, determines that the 22 language still is not "reasonably susceptible" to the interpretation urged and therefore does not admit 23 the extrinsic evidence. *Id.*; *see Pac. Gas & Elec.*, 442 P.2d at 645 ("[E]xtrinsic evidence is not 24 admissible to add to, detract from, or vary the terms of a written contract . . . ."). First, Defendants 25 offer evidence of their subjective understanding of the letter agreement. Specifically, Defendants

26

27
28 [2] Defendants' further argument that the letter agreement is unclear on its face because it "does not express any . . . waiver or preclusive effect" is unavailing. (Opp'n 13.) Under Defendants' theory, every contract is ambiguous unless it includes a provision stating that its terms are final and not subject to further revision.

- 7 - 10cv762

contend that:

> [T]he parties' understanding of the July [sic] 30, 2009 Letter Agreement was informed by an earlier February 26, 2009 letter agreement involving the First Earn Out. Because that earlier letter agreement was an interim measure used to satisfy certain immediate concerns by Plaintiff, but ultimately abandoned by Plaintiff, Ebix considered the June 30, 2009 Letter Agreement to be a similar interim measure that the parties used to resolve the First Earn Out, but without changing the formula for determining the contingent consideration to be paid Plaintiff.

(Opp'n 2; *see also* Doc. No. 39-1 (Kerris Decl.) ¶ 10 ("Ebix believed that the June 30, 2009 letter agreement was an interim measure and did not alter the parties' fundamental understanding regarding how contingent consideration was to be calculated under the terms of the Merger Agreement."); *id.* ("Ebix understood that, if Ebix should ultimately determine to have overpaid the First Earn Out, the letter agreement did not contemplate or express any waiver of its ability to offset that overpayment against the Second Earn Out.").) Defendants' subjective understanding that the letter agreement was an "interim measure," however, is irrelevant to the Court's interpretation. *See Titan Group, Inc. v. Sonoma Valley Cnty. Sanitation Dist.*, 211 Cal. Rptr. 62, 65 (Cal. Ct. App. 1985) ("It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation."); *see also Reigelsperger v. Siller*, 150 P.3d 764, 767 (Cal. 2007) ("[U]ncommunicated subjective intent is irrelevant.").

Second, Defendants argue that the parties' conduct regarding the first earn out supports Defendants' proposed interpretation. (Opp'n 10–12.) On February 26, 2009, the parties entered into a letter agreement regarding the first earn out. (*See* Kerris Decl. Ex. A.) The February 26, 2009 letter agreement provided:

> In no event will Parent's good faith calculation of the actual First Earn Out be less than $3,094,730 (in particular, the Company's Gross Revenue for the nine month period ending September 30, 2008 shall be no less than $3,581,000, and the Company's Gross Revenue for the three month period ending December 31, 2008 shall be no less than $1,450,000.

(*Id.*) Thus, pursuant to the February 26, 2009 letter agreement, the parties agreed to calculate the first earn out based on estimated 2008 gross revenue of $5,031,000. Defendants paid the first earn out accordingly. (*Id.* ¶ 4.) Thereafter, on April 3, 2009, Defendants provided Plaintiff with an amended and restated contingent gross revenue certificate indicating that Defendants' 2008 gross revenue totaled $4,928,259. (*Id.* Ex. B.) On April 21, 2009, Defendants' controller provided Plaintiff with

1 a spreadsheet prepared by an outside auditor indicating 2008 gross revenue of $5,120,210. (Kerris
2 Decl. Ex. C.) At that point, a dispute arose because the 2008 gross revenue figure that Defendants'
3 outside auditor provided did not match the figure contained in the amended and restated contingent
4 gross revenue certificate. (*See* Doc. No. 40-2 (Pl.'s RJN) Ex. B, at EXB_0011.)[3] That dispute was
5 settled by the June 30, 2009 letter agreement, under which the parties agreed that the second earn out
6 would be calculated based on 2008 gross revenue of $5,120,210. (Irving Decl. Ex. D, at EXD_0095.)

7 Simply put, the Court cannot fathom how this course of conduct supports Defendants'
8 proposed interpretation of the letter agreement. Defendants contend that the interpretation they urge
9 is reasonable because, after Defendants provided the amended and restated contingent gross revenue
10 certificate on April 3, 2009, Plaintiff "did not claim that he was owed contingent consideration based
11 upon" the figure agreed upon in the February 26, 2009 letter agreement. (Opp'n 11.) This argument
12 is misleading. Plaintiff had no reason to claim Defendants should pay the first earn out based on the
13 earlier figure because the first earn out had already been paid. (*See* Kerris Decl. ¶ 4.) And Plaintiff
14 preserved his claim to payment of the second earn out based on the earlier figure by "request[ing],
15 through his consultant Casey Kinslow, additional information and documents supporting the Amended
16 Certificate." (Opp'n 11.) Nothing in this course of conduct indicates, as Defendants suggest, that the
17 letter agreement preserved Defendants' right to "offset any overpayment made in the First Earn Out
18 from the Second Earn Out, since such an offset would appropriately recognize the appropriately
19 recognize the parties' intentions as expressed in their Merger Agreement." (*Id.* at 12.) Rather, the
20 parties' conduct regarding the first earn out illustrates the parties' willingness to waive the merger
21 agreement's requirements by substituting a mutually agreeable figure for 2008 gross revenue.

22 Finally, Defendants contend that the merger agreement illustrates the parties' intent to
23 calculate contingent consideration based on actual gross revenue, and "the Letter Agreement did not

---

[3] Plaintiff moves the Court to take judicial notice of Plaintiff's June 8, 2009 direct claim notice against Defendants and Defendant's second earn out report dated February 12, 2010. (Pl.'s RJN Exs. B, C.) Both documents were previously lodged with the Court. (*See* Doc. No. 4-2 (Kinslow Decl. ISO Appl. for Writ of Attach.) Ex. F (second earn out report); Doc. Nos. 10-1 to -2 (Kerris Decl. ISO Opp'n to Appl. for Writ of Attach.) Ex. E (direct claim notice).) The Court finds that each of these documents is properly judicially noticed. *Chandler v. United States*, 378 F.2d 906, 909 (9th Cir. 1967) ("[A] federal district court can take judicial notice of its own records . . . ."); *see* Fed. R. Evid. 201. Accordingly, the Court **GRANTS** Plaintiff's motion for judicial notice of the above-listed documents.

1  change that intent." (Opp'n 9.) The Court disagrees. As discussed above, a dispute arose because
2  the 2008 gross revenue figure provided by Defendants' outside auditor did not match the figure
3  contained in the amended and restated contingent gross revenue certificate. (*See* Pl.'s RJN Ex. B, at
4  EXB_011.) In settlement of that dispute, the parties agreed by way of the letter agreement that the
5  second earn out would be calculated based on 2008 gross revenue of $5,120,210. Contrary to
6  Defendants' assertion, the letter agreement expressed a clear and unambiguous intent to calculate the
7  second earn out based not on actual 2008 gross revenue, but on the 2008 gross revenue figure agreed
8  upon by way of the letter agreement.

### *B.     Breach*

The conclusion that the agreement obligated Defendants to calculate the second earn out based on the 2008 gross revenue figure agreed upon by was of the letter agreement does not end the Court's inquiry. Rather, the Court also must determine whether Defendants breached the agreements between the parties.

Plaintiff's argument is not entirely clear. He appears to argue that his damages stem from combined breaches of the merger agreement and the letter agreement. (*See* Mem. ISO MSJ 9 ("[D]efendants' improper deduction of the $213,393 arises from their breaches of the written Merger Agreement and the 2009 Letter Agreement . . . .").) Defendants effectively ignore the issue of breach and, instead, focus only on interpretation of the letter agreement. (Opp'n 13 ("To the extent that the Court believes the Letter Agreement is also susceptible to Plaintiff's interpretation, then a factual dispute exists with respect to the material issue of the parties' intent with respect to Defendants' obligations under the Letter Agreement.").) Although the Court could simply take Defendants' silence as concession, it declines to do so and proceeds to the issue of breach.

"A claim for breach of contract under California law consists of the following elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage resulting from the breach." *Alcalde v. NAC Real Estate Invs. and Assignments, Inc.*, 316 F. App'x 661, 662 (9th Cir. 2009) (citing *First Commercial Mortg. Co. v. Reece*, 108 Cal. Rptr. 2d 23, 33 (Cal. Ct. App. 2001)).

Here, the Court finds that Defendants did not breach the letter agreement by deducting

1  $213,393 from the second earn out. Based on the second earn out report, it appears that Defendants
2  calculated the second earn out based on 2009 gross revenue of $7,253,538 and 2008 gross revenue of
3  $5,120,210—the 2008 gross revenue figure agreed upon by way of the letter agreement. (*See* Compl.
4  Ex. F (contingent gross revenue certificate for second earn out).) That is, Defendants certified the
5  amount of the second earn out by subtracting $5,120,210 from $7,253,538 and multiplying the
6  difference by the second earn out multiplier—1.538. (*Id.*; *see* Merger Agm't § 1.2(b).) Based on
7  those figures, Defendants concluded that Plaintiff was entitled to cash consideration on the second
8  earn out of $3,281,058 ($7,253,538 – $5,120,210 = $2,133,328 * 1.538 = $3,281,058). (*See* Compl.
9  Ex. F.) *Thereafter*, Defendants deducted from the cash consideration owing on the second earn out,
10 *inter alia*, $213,393 allegedly attributable to an overstatement of the 2008 gross revenue figure used
11 to calculate the first earn out. The letter agreement, by its terms, did not prohibit Defendants from
12 deducting from the second earn out amounts attributable to overpayment of the first earn out, so long
13 as the agreed upon 2008 gross revenue figure was used to calculate the second earn out.

14 Nevertheless, the Court concludes that Defendants' deduction of $213,393 from the second
15 earn out breached the merger agreement. Section 1.2(b) provides a specific formula for calculating
16 the second earn out, whereby 2008 gross revenue must be subtracted from 2009 gross revenue, and
17 the difference multiplied by 1.538. (Merger Agm't § 1.2(b).) This is the entire formula, and it is clear
18 on its face. Nowhere does section 1.2(b)—or any other provision of the merger agreement—provide
19 for deductions attributable to overpayments of prior earn outs. Thus, Defendants' breached the merger
20 agreement when they deducted from the cash consideration owing on the second earn out $213,393
21 allegedly attributable to an overstatement of the 2008 gross revenue figure used to calculate the first
22 earn out, and Plaintiff was damaged in the same amount.

23 *C.     **Prejudgment Interest***

24 Additionally, Plaintiff argues that Defendants are liable for prejudgment interest on this
25 amount "at ten percent (10%) per annum from January 30, 2010." (Mem. ISO MSJ 9 (citing Cal. Civ.
26 Code § 3289).) Plaintiff is correct. The merger agreement and the letter agreement, read together,
27 obligated Defendants to pay the second earn out based on 2008 gross revenue of $5,120,210 on
28 January 30, 2010. (Merger Agm't § 1.2(b); Irving Decl. Ex. D, at EXD_0095.) As the Court

1  concluded above, Defendants breached the merger agreement by deducting $213,393 from the second
2  earn out. Accordingly, Plaintiff is entitled to prejudgment interest in the amount of $25,548.70
3  ($213,393 * 10% * (437 days/365 days)).[4]

### CONCLUSION

For the reasons stated, the Court **GRANTS** Plaintiff's motion for partial summary judgment. To facilitate the arbitration of the remainder of this case, the parties **SHALL APPEAR** before this Court on <u>May 12, 2011 at 1:30 p.m. in Courtroom 6</u>. The parties **SHALL BE PREPARED** to discuss their plans for moving this case to a full conclusion.

**IT IS SO ORDERED.**

DATED: April 12, 2011

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge

---

[4] Because the eight percent interest rate specified in the merger agreement only "applies to any disputed items on which Plaintiff prevails in front of the independent accountant" (Writ of Attach. Order 13), the default interest rate of ten percent per annum set forth in California Civil Code section 3289(b) is applicable, *see* Cal. Civ. Code § 3289.